UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JULIA A. GUERRA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:15-cv-00224-SLC |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Julia A. Guerra appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

### I. PROCEDURAL HISTORY

Guerra applied for DIB and SSI in September 2012, alleging disability as of May 30, 2009. (DE 12 Administrative Record ("AR") 197-213). Guerra was last insured for DIB on December 31, 2009 (AR 42, 123), and thus, with respect to her DIB claim, she must establish that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that with respect to a DIB claim, a claimant must establish that she was disabled as of her date last insured in order to recover DIB).

The Commissioner denied Guerra's application initially and upon reconsideration. (AR

---

[1] All parties have consented to the Magistrate Judge. (DE 15); *see* 28 U.S.C. § 636(c).

97-98, 123-31). After a timely request (AR 152), a hearing was held on April 2, 2014, before Administrative Law Judge Steven Neary ("the ALJ"), at which Guerra, who was represented by counsel, and a vocational expert, Marie Kieffer (the "VE"), testified (AR 37-74). On May 16, 2014, the ALJ rendered an unfavorable decision to Guerra, concluding that she was not disabled because she was capable of performing her past relevant work as an escort-vehicle driver despite the limitations caused by her impairments. (AR 17-32). The Appeals Council denied Guerra's request for review (AR 1-13), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Guerra filed a complaint with this Court on August 19, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Guerra argues that: (1) the ALJ's step-four finding is not supported by substantial evidence because the ALJ failed to resolve a conflict between the VE's testimony and the *Dictionary of Occupational Titles* ("DOT"); and (2) the ALJ improperly "played doctor" in assessing her residual functional capacity ("RFC"). (DE 18 at 5-11).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Guerra was 52 years old (AR 32, 197); had a ninth grade education (AR 225); and had work experience as a dispatcher and an escort-vehicle driver (AR 274).

### A. Guerra's Testimony at the Hearing

At the hearing on April 2, 2014, Guerra, who was five feet, four inches tall and weighed 272 pounds, testified that she lives with her husband, who had undergone bilateral leg

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 621-page administrative record necessary to the decision.

amputations within the last three years.[3] (AR 39-40, 51-52, 54). She was without health insurance at the time of the hearing. (AR 57). She had been laid off from her last job as an escort-vehicle driver, but she stated that if she had not been laid off, she would have continued working in the job. (DE 40-41). She added, however, that there did come a time—approximately three years earlier—when she thought she could no longer have performed the escort-vehicle driver job due to her limitations. (AR 41-43).

Guerra stated that she does not have a daily schedule, and about five days a month she does not even get out of bed. (AR 48-49). When she does get out of bed, she relaxes on the couch and sleeps until noon, watches television, naps in the afternoon, and then makes dinner. (AR 48). Sometimes she drives to visit her friends and family. (AR 49). She is independent with her self care, though she has some difficulty washing her hair. (AR 49).

When asked why she thought that she could not work, Guerra stated that her knees and right shoulder "pop out" at times; she has difficulty concentrating; and she has shoulder arthritis, which has caused tingling and weakness in her right arm for the past six months. (AR 42-45). She added that sometimes she feels dizzy and then has an anxiety attack. (AR 53-54). Guerra conceded that her knees had been "popping out" for seven years and that this condition did not prevent her from working as an escort-vehicle driver during that time. (AR 44-45). During the hearing, Guerra informed the ALJ that her "knee [had] just popped out" (AR 44-45), describing the pain as "sharp" and "burning" (AR 46). As to her concentration difficulties, Guerra stated that she has difficulty concentrating while reading because her mind wanders or people talk to her, and then she has to reread the text. (AR 44).

---

[3] In her Adult Function Report completed in October 2012, Guerra stated that she takes care of her husband. (AR 243). Her daughter assists her in the duty on a part-time basis. (AR 243).

To treat her pain, Guerra was taking pain medication (Norco), which was helpful, and she had received a cortisone injection in her right shoulder, which was not helpful. (AR 45). She does not experience side effects from her medication. (AR 46). She estimated that she could walk one block, stand for 10 minutes, lift a gallon of milk, and sit without limitation. (AR 46-47).

### B. Summary of the Relevant Medical Evidence

In February 2006, Guerra saw Leonard Kibiloski, M.D., for right knee pain after she slipped on a rug the previous day. (AR 513-15). X-rays revealed mild medial compartment arthritis. (AR 515). Dr. Kibiloski diagnosed her with a right knee contusion and right knee degenerative arthritis. (AR 515). He instructed her to continue activity as tolerated with full weight bearing. (AR 515). A March 2006 MRI revealed a possible chronic small tear of her anterior cruciate ligament, moderate degenerative joint disease, hypertrophic changes, and moderate effusion. (AR 443). Guerra was scheduled for surgery in May 2006, but cancelled it due to financial issues. (AR 499-505).

In April 2007, Guerra was in an auto accident and tore her right rotator cuff and left and right menisci. (AR 434-37, 440-41, 516-19). Osteoarthritic changes in her right shoulder and a chronic, complete ACL tear were also discovered. (AR 434-47, 440-41). Guerra underwent an acromioplasty on her right shoulder in July 2007. (AR 459-63, 587-89).

Guerra continued to complain of knee and shoulder pain through January 2014. (AR 301, 338, 369-71, 373-75, 386-87). In 2012, Guerra was diagnosed with major depressive disorder, post traumatic stress disorder, generalized anxiety disorder, dysthymic disorder, and rule out attention deficit/hyperactivity disorder. (AR 282-83, 316-20).

On November 27, 2012, Donna Unversaw, Ph.D., a state agency psychologist, reviewed Guerra's record and opined that she had a mild restriction in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (DE 79). Dr. Unversaw further opined that Guerra was moderately limited in the following abilities: carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruption from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and accepting instructions and responding appropriately to criticism from supervisors. (AR 81-82). Dr. Unversaw concluded in her narrative that Guerra was "capable of working in an environment that does not emphasize frequent/close contact with the public, coworkers, nor speed production, or complex task resolution." (AR 83). On March 28, 2013, Kenneth Neville, Ph.D., another state agency psychologist, reviewed Guerra's record and reiterated the conclusions reached by Dr. Unversaw. (AR 103-04, 106-08, 115-16).

On December 21, 2012, J. Corcoran, M.D., a state agency physician, reviewed Guerra's record and opined that she could lift 25 pounds frequently and 50 pounds occasionally; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; and occasionally climb ramps, stairs, ladders, ropes, and scaffolds. (AR 80-81). On March 19, 2013, Fernando Montoya, M.D., another state agency physician, reviewed Guerra's record and reiterated the conclusions reached by Dr. Corcoran. (AR 104-06, 116-18).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

5

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological

6

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On May 15, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 17-32). The ALJ noted at step one of the five-step analysis that Guerra had not engaged in substantial gainful activity since her alleged onset date. (AR 19). At step two, the ALJ found that Guerra had the following severe impairments: status post right

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

7

shoulder rotator cuff repair, history of bilateral knee meniscal tear, right knee degenerative changes, history of plantar fasciitis, obesity, depression, and anxiety/post traumatic stress disorder. (AR 19).

At step three, the ALJ concluded that Guerra did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 21). Before proceeding to step four, the ALJ determined that Guerra's symptom testimony was not entirely credible and assigned the following RFC:

> [T]he claimant has the [RFC] to perform sedentary work . . . except: only occasional climbing, crouching, crawling, kneeling, and stooping; no complex or detailed tasks, but the claimant remains capable of performing simple, routine tasks throughout the workday; no close contact with the public or coworkers; and, no occupations that require a rapid pace.

(AR 23).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Guerra was capable of performing her past relevant work as an escort-vehicle driver. (AR 31). Accordingly, Guerra's applications for DIB and SSI were denied. (AR 32).

### C. *The ALJ's Step-Four Finding Is Supported by Substantial Evidence*

Guerra first argues that the ALJ's step-four finding is not supported by substantial evidence because the ALJ purportedly failed to resolve a conflict between the VE's testimony and the DOT. Guerra's challenge to the ALJ's step-four finding is ultimately unconvincing.

An ALJ has an affirmative duty under Social Security Ruling ("SSR") 00-4p to ask the vocational expert about any possible conflict between his or her testimony and the information provided in the DOT. SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006). The ALJ also has a duty to identify any

8

apparent conflict between the VE's testimony and the DOT—that is, a conflict "obvious enough that the ALJ should have picked up on [it] without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). The ALJ "must explain the resolution of the conflict irrespective of how the conflict was identified." SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *see also Prochaska*, 454 F.3d at 735; *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002); *Greenwood v. Barnhart*, 433 F. Supp. 2d 915, 930 (N.D. Ill. 2006). In the event there is no apparent or identified conflict, "an ALJ may rely on imperfect VE testimony if a claimant does not question the basis for the testimony at the time of the hearing." *Overman*, 546 F.3d at 465 (citing *Donahue*, 279 F.3d at 446; *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004)). Ultimately, any error by the ALJ with respect to his inquiry, or lack thereof, into a potential conflict between the VE's testimony and the DOT "is harmless unless there actually was a conflict." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

At the hearing, the VE responded to various hypotheticals posed by the ALJ, testifying that a hypothetical individual with Guerra's age, education, work experience, and assigned RFC could perform her past relevant work as an escort-vehicle driver. (AR 67-68). The ALJ, in accordance with SSR 00-4p, then asked the VE whether his testimony had been consistent with the DOT, and the VE responded that it was. (AR 68). Guerra's counsel did not object or directly question the VE about this statement. (AR 68).

Instead, Guerra's counsel proceeded to cross-examine the VE about the impact on the hypothetical individual if certain additional limitations were incorporated. (AR 69-72). Specifically, Guerra's counsel inquired whether the hypothetical individual could perform the

escort-vehicle driver job if the restriction of "no multi-tasking" were added. (AR 69). Counsel described "multi-tasking" in the context of driving as "paying attention to all sorts of different things, not just the speedometer."[5] (AR 69). The VE responded: "Well, temperament[] for the escort vehicle driver is consistent with performing repetitive work, or performing continuously the same work, according to a set of procedures." (AR 69).

Guerra argues that her attorney's cross-examination of the VE about the additional limitation of "no multi-tasking" was sufficient to put the ALJ on notice of a conflict between the VE's testimony and the DOT, triggering the need for further inquiry into the purported conflict by the ALJ. *See Overman*, 546 F.3d at 463 ("[If] evidence from a VE 'appears to conflict with the DOT,' SSR 00-4p requires further inquiry: an ALJ must obtain 'a reasonable explanation for the apparent conflict.'" (quoting SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000))). The Court disagrees.

To explain, the DOT describes an escort-vehicle driver, DOT Code 919.663-022, as follows:

> Drives vehicle equipped with warning lights and signs to escort

---

[5] Guerra's counsel cross-examined the VE about the effect of other proposed additional limitations as well. He inquired whether the hypothetical individual could perform the escort-vehicle driver job if she could concentrate on a task no longer than 30 minutes at a time, to which the ALJ responded, "No." (AR 69). Guerra's counsel also asked if the hypothetical individual could perform the escort-vehicle driver job if the restriction of no unpredictable circumstances were added; the VE responded that to deal with the mental requirements of unskilled work, the hypothetical individual must be able to adapt to the regular changes or situations that would occur in driving, which the VE characterized as "minor." (AR 69-70). Guerra's counsel next inquired about the typical break schedule and absenteeism tolerance in unskilled work. (AR 70). The VE responded that an unskilled worker is typically allowed a 15-minute break in the morning, a lunch break of 30 to 60 minutes, and a 15-minute break in the afternoon; and that if an individual consistently misses two to three days of work a month, or more than 12 days in a year beyond the normal excused sick or vacation days, then she would not be able to sustain competitive employment. (AR 70-71). Guerra's counsel also inquired whether the hypothetical individual could perform the escort-vehicle driver job if a limitation of occasional use of the dominant upper extremity were added, to which the VE responded in the negative, stating that the job required frequent handling. (AR 71). Finally, Guerra's attorney asked the VE how many times an unskilled worker could have a screaming outburst at another employee; the VE responded that more often than not, such an outburst would not be tolerated. (AR 72).

>   trucks hauling mobile homes on public thoroughfares: Precedes
>   escort and maintains specified distance between pilot vehicle and
>   escort to provide warning to other motorists and to clear traffic at
>   locations. Communicates by two-way radio with truck and other
>   pilot vehicle drivers to coordinate changes in speed and route,
>   emergencies, or traffic congestion.

DOT, http://www.occupationalinfo.com/91/919663022.html (last visited Nov. 18, 2016).

The escort-vehicle driver job has a specific vocational preparation ("SVP") designation of 2.

DOT, http://www.occupationalinfo.com/91/919663022.html (last visited Nov. 18, 2016). SVP is the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. Social Security Administration, *Program Operations Manual System* ("POMS") § 25001.001, https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001 (last visited Nov. 18, 2016). "Using the skill level definitions in 20 CFR [§§] 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."[6] SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

Thus, the DOT categorizes the job of escort-vehicle driver as unskilled work. As such, there is no apparent conflict between: (1) the VE's testimony that a hypothetical individual limited to "simple, routine tasks" and "no complex or detailed tasks" could perform the escort-vehicle driver job, and (2) the DOT's description of the escort-vehicle driver job. Nor was Guerra's counsel's inquiry to the VE on cross-examination concerning an additional restriction of "no multi-tasking" sufficient to trigger the ALJ's duty to inquire further about a possible

---

[6] More specifically, "[a]n SVP 1 designation means a job that requires a short demonstration only to prepare the person to perform the job. An SVP 2 designation means a job that requires anything beyond a short demonstration up to and including one month of instruction to prepare the person to perform the job." *Sigite v. Colvin*, No. 13-3140, 2015 WL 1887774, at *16 (C.D. Ill. Apr. 24, 2015) (citation omitted); *see also* POMS § 25001.001, https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001 (last visited Nov. 18, 2016).

conflict between the VE's testimony and the DOT, as the VE consistently described the escort-vehicle driver job as unskilled work. *Cf. Overman*, 546 F.3d at 463 (stating that the vocational expert contradicted himself on cross examination, and thus, "[t]he conflicts between the VE's supposedly DOT-based testimony on direct and his statements on cross-examination . . . should have been apparent to the ALJ").

Not to be deterred, Guerra also argues that the ALJ's step-four finding is not supported by substantial evidence because it was based on "unreliable testimony" by the VE. (DE 18 at 7). Specifically, Guerra contends that the "reasoning level" of the escort-vehicle driver job—that is, the general education development ("GED") level—is inconsistent with the assigned RFC and the hypothetical posed by the VE. (DE 18 at 8). The GED "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." DOT, http://www.occupationalinfo.org/appendxc_1.html (last visited Nov. 18, 2016). The escort-vehicle driver job is a GED reasoning level 2 job, and as such, Guerra emphasizes that it requires the ability to apply "commonsense understanding to carry out *detailed* but uninvolved written or oral instructions" and to deal "with problems involving a *few concrete variables* in or from standardized situations." (DE 18 at 8 (citation omitted)); *see* DOT, http://www.occupationalinfo.org/appendxc_1.html (last visited Nov. 18, 2016).

As this Court recently observed in *Marshall v. Colvin*, district courts in this Circuit are divided on whether restrictions such as the one contained in Guerra's RFC are inconsistent with a job at GED reasoning level 2. No. 4:12-CV-075 JD, 2014 WL 1230219, at *21 (N.D. Ind. Mar. 25, 2014) (comparing *Simms v. Astrue*, 599 F. Supp. 2d 988, 1007 (N.D. Ind. 2009), with *Thompkins v. Astrue*, No. 09 c 1339, 2010 WL 5071193, at *11 (N.D. Ill. Dec. 6, 2010)). "The

Seventh Circuit [Court of Appeals] has not spoken on the exact issue of whether Reasoning Level 2 is inconsistent with this sort of RFC; however, the Seventh Circuit has considered Reasoning Level 3—one step more demanding than Reasoning Level 2—and found it could be consistent with 'simple' tasks." *Id*. (citing *Terry*, 580 F.3d at 478; *Sawyer v. Colvin*, 512 F. App'x 603, 610-11 (7th Cir. 2013)); *see Huttner v. Colvin*, No. 13 CV 6606, 2015 WL 9473425, at *5 (N.D. Ill. Dec. 28, 2015) (finding no conflict between the cashier job's GED reasoning level 3 and the RFC for simple, routine, and repetitive tasks, and consequently finding that the ALJ was not obligated to question the vocational expert about the cashier job's reasoning level). As such, the Court declines to find that the GED reasoning level 2 is inconsistent with the RFC assigned to Guerra.

Moreover, Guerra's counsel did not ask the VE about the GED reasoning requirements of the escort-vehicle driver job at the hearing. As explained earlier, "an ALJ is entitled to rely on unchallenged VE testimony." *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (citations omitted). Nor was the purported conflict of the type to be apparent to the ALJ during the hearing. *See Diaz v. Colvin*, No. 2:12-CV-46-PRC, 2013 WL 5460151, at *13 (N.D. Ind. Sept. 30, 2013) (finding that a purported conflict between a job with GED reasoning level 2 and the claimant's limitation to one- to two-step tasks was not so obvious that the ALJ should have picked up on the conflict without the assistance of counsel); *Pomilia v. Astrue*, No. 2:11-CV-15-PRC, 2012 WL 691628, at *20 (N.D. Ind. Mar. 2, 2012) (same).

In any event, Guerra does not point to any evidence of record that suggests she is incapable of this GED reasoning level 2 job. After all, she performed the escort-vehicle driver job until she was laid off in 2008 or 2009, and she testified that would have continued to perform

13

the job for several more years had she not been laid off. *See Givens v. Colvin*, 551 F. App'x 855, 863 (7th Cir. 2013) (explaining that the GED levels "focus on the worker's educational background, not on on-the-job requirements" (citation omitted)). Furthermore, Guerra's past work as a dispatcher was a GED level 3 job. *See id*. ("[GED] embraces those aspects of education (formal and informal) which are required of the worker for satisfactory performance. . . . Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study." (citation omitted)). As such, the Court is not persuaded by Guerra's argument that the GED level 2 designation of the escort-vehicle driver job conflicts with the assigned RFC.

In a final effort, Guerra contends that the escort-vehicle driver job is inconsistent with the social limitation of the assigned RFC and hypotheticals requiring "no close contact with the public or co-workers." (AR 23). She asserts that the escort-vehicle driver job "clearly involves at least frequent and in-depth communication between members of the convoy 'to coordinate changes in speed and route, emergencies, or traffic congestion'" (DE 18 at 8 (citation omitted)). The description of the escort-vehicle driver job at the hearing, however, did not suggest that it required close contact with others. (AR 40-41, 60-61, 67-73). That is, neither Guerra's testimony nor the VE's testimony presented any type of apparent conflict concerning contact with others with respect to the escort-vehicle driver job. (AR 40-41, 60-61, 67-73); *see Stark v. Astrue*, 278 F. App'x 661, 667 (7th Cir. 2008) ("[The vocational expert's] testimony does not present any apparent conflict with the DOT, and so the ALJ had no reason to doubt his assurance that the jobs he described corresponded to the DOT definitions."). As such, Guerra's argument rests entirely on the written description of the job in the DOT, which is *not* part of the hearing

14

record. Because the purported conflict about contact with others was not obvious at the hearing, the ALJ did not have a duty to further inquire into this possible conflict. *Overman*, 546 F.3d at 464. Nor were Guerra's counsel's questions on cross examination of the nature to put the ALJ on notice of a possible conflict concerning contact with others in the escort-vehicle driver job. (AR 69-70). As a result, Guerra's assertion that the ALJ failed to resolve a conflict based on her social limitation is unpersuasive.

In sum, neither of Guerra's arguments regarding the ALJ's step-four finding merits a remand. The ALJ's step-four finding is supported by substantial evidence.

### D. *The RFC Assigned by the ALJ Is Supported by Substantial Evidence*

In her second argument, Guerra contends that the RFC assigned by the ALJ is not supported by substantial evidence. Specifically, Guerra argues that the ALJ improperly "played doctor" by assigning a physical RFC that was more conservative than the limitations assigned by Drs. Corcoran and Montoya, the state agency physicians, who were the only doctors of record to specifically opine about her physical abilities. Guerra further asserts that when the ALJ "rejected the only opinions of record regarding [her] physical RFC," he should have solicited an updated opinion from a medical expert, rather than "improperly reach[] an RFC with no expert guidance." (DE 18 at 10-11). Ultimately, Guerra's arguments challenging the assigned RFC are unpersuasive.

Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1545(e), 416.945(e); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[A] medical source statement must not be equated with the administrative

15

finding known as the RFC assessment."). The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC assessment:

> is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545, 416.945. Thus, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ.

Here, Drs. Corcoran and Montoya opined that Guerra's physical limitations were consistent with an ability to perform medium work. In analyzing Guerra's RFC, the ALJ considered Drs. Corcoran's and Montoya's opinions, but ultimately decided to assign them little weight, explaining that "the record as a whole supports that the claimant would be incapable of sustaining work at the medium exertional level on a continuing basis." (AR 28). The ALJ elaborated: "While a finding that the claimant has been capable of performing work at the light exertional level is not without support, in granting deference to the claimant, and taking into account the history of shoulder surgery and recent imaging, the claimant's functional capacity provides for only sedentary work." (AR 28). Therefore, the ALJ assigned Guerra an RFC even more conservative than the limitations opined by Drs. Corcoran and Montoya—which were the only doctors to opine about Guerra's physical limitations. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work.").

16

As explained above, "[an] ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Rather, "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.152(d)). In doing so, the ALJ "must consider the entire record, including all relevant medical and nonmedical evidence," and thus, he "need not accept only physicians' opinions." *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); see *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("Of course the administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence—which need not itself be medical in nature . . . .").

In accordance with this authority, the ALJ considered not only the medical evidence of record, but also the nonmedical evidence. For example, the ALJ considered that Guerra had been her husband's primary caregiver since his bilateral leg amputations and that she had been responsible for the majority of the household chores. (AR 28-30, 243, 282, 317; *see* DE 18 at 2). As such, he reasoned that Guerra's daily activities would "support a capacity well beyond the sedentary level," characterizing the assigned RFC for sedentary work as "very generous." (AR 28-29). Additionally, the ALJ considered that Guerra had been looking for work in July 2012, as she told a medical source of record that she had turned down a job offer the previous day for 20 hours a week, $10 per hour, because of the job's distance from her home and the cost of gas to get there. (AR 30, 283).

Moreover, this is not a case of conflicting medical opinions. Rather, as the ALJ observed, none of Guerra's treating physicians offered an opinion regarding her physical

17

capacity. (AR 28). "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *see also Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citing 20 C.F.R. § 416.912(c)). "It is not unreasonable to require the claimant, who is in a better position to provide information about [her] own medical condition, to do so." *Bowen*, 482 U.S. at 146 n.5.

In that same vein, Guerra's assertion that the ALJ should have called a medical expert is without merit. The ALJ has discretion to consult a medical expert, but he certainly is not required to do so. 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts . . . . ). The applicable regulations and Seventh Circuit case law clearly leave it to the discretion of the ALJ to consult a medical expert when the evidence received is inadequate for the ALJ to determine whether the claimant is disabled. *See Poyck v. Astrue*, 414 F. App'x 859, 861 (7th Cir. 2011); *Similia v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009); *Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); 20 C.F.R. §§ 404.1512(e), 416.1512(e). Here, Guerra has failed to show that the ALJ abused his discretion in choosing not to consult a medical expert.

Furthermore, "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making [her] strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).

Guerra was represented by counsel at the hearing, and counsel did not suggest that a medical expert or additional evidence was necessary to decide Guerra's claim. (AR 39-73); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 697 (7th Cir. 2010) (stating that a claimant who is represented by counsel is presumed to put on her best case, and counsel's failure to request an additional medical opinion supports the inference that it would not have made a difference).

In sum, Guerra's two arguments challenging the RFC do not merit a remand of the Commissioner's final decision. The RFC, which is a finding reserved to the Commissioner, is supported by substantial evidence.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Guerra.

SO ORDERED.

Entered this 18th day of November 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge